# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SP NEWSPRINT HOLDINGS LLC, et al.,[1] | ) | Case No. 11-13649 (CSS) |
| | ) | |
| | ) | Joint Administration Pending |
| Debtors. | ) | |
| | ) | |

## DEBTORS' MOTION FOR ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO LENDERS, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion") for entry of an order, pursuant to Bankruptcy Code §§ 361, 362, 363, 503, and 507, Bankruptcy Rule 4001, and Local Rule 4001-2, (i) authorizing use of cash collateral (as defined in Bankruptcy Code § 363(a), "Cash Collateral"),[2] (ii) granting adequate protection to the Lenders (as defined below), and (c) granting related relief. In support of the relief requested in this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each of the Debtors' tax identification numbers, are: SP Newsprint Holdings, LLC (6180); SP Newsprint Co. LLC (7779); SP Recycling Corporation (2936); and SEP Technologies, L.L.C. (2955).

[2] Bankruptcy Code § 363(a) defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title ... ."

§§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are Bankruptcy Code §§ 361, 362, 363(a), (c), (d), and (e), 503(b), and 507(a) and (b), Bankruptcy Rule 4001, and Local Rule 4001-2.

## INTRODUCTION

2. On November 15, 2011 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have sought an order directing that their Chapter 11 cases be jointly administered by this Court, and they have filed additional motions (some of which seek emergency relief) in the proposed lead case of SP Newsprint Holdings LLC.

3. The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these cases.

<u>The Debtors and Their Business</u>

*SP Newsprint Holdings LLC*

4. SP Newsprint Holdings LLC, a Delaware limited liability company, is the direct or indirect corporate parent of all of the other Debtors.

*SP Newsprint Co., LLC*

5. SP Newsprint Co., LLC ("SP"), a Georgia limited liability company and one of the Debtors' two main operating companies, is one of the largest producers of newsprint (paper on which newspapers are printed) in North America. SP operates two newsprint mills located in Dublin, Georgia, and Newberg, Oregon.

6. The Dublin mill, which is located 145 miles southeast of Atlanta, Georgia, was opened in 1979 and is currently one of the largest 100% recycled newsprint mills in North America. The Newberg mill, which is located 25 miles southwest of Portland, Oregon,

2
RLF1 5592991v. 1

was acquired by SP in 1999 and is one of only three suppliers on the West Coast able to meet California's stringent recycled content requirement for newsprint.

*SP Recycling Corporation*

7. SP Recycling Corporation ("SPRC"), a Georgia corporation and the Debtors' other operating company, was established in 1980 as a means for SP to secure a ready supply of recycled fiber, a key raw material for newsprint.

8. SPRC currently has 23 recycling centers in nine states that annually collect and/or purchase approximately 941,000 metric tons of old newspaper (ONP), 140,000 tons of sawmill residual chips, 295,000 tons of other paper grades, and 97,000 tons of other materials through drop-off and curbside collections and long-term contracts with various municipalities. SPRC also handles a range of other recyclable materials, including metals and plastic, which are sorted and resold to other recycling firms. In addition to the material it collects, SPRC buys ONP on the open market from suppliers in 22 states.

*SEP Technologies, L.L.C.*

9. SEP Technologies, L.L.C., a Delaware limited liability company, does not currently have any operations or material assets.

The Debtors' Employees

10. As of the Petition Date, the Debtors employed approximately 670 people.

11. Certain high-level managerial functions are provided by Brant Industries, Inc. ("BI"), in exchange for a management fee. For more than three months prior to the Petition Date, to help preserve the Debtors' liquidity, BI deferred collecting its management fee. The management fee is included in the Debtors' proposed budget for these cases and is anticipated to be paid in the ordinary course of business as an administrative expense of the Debtors' estates.

The Debtors' Capital Structure

12. On or about March 31, 2008, SP Newsprint Merger LLC (a predecessor of the Debtors), as borrower, and each of the Debtors, as guarantors, entered into a $275 million credit agreement (as amended from time to time and including all related documents, schedules, and agreements, the "Credit Agreement") with General Electric Capital Corporation ("GECC"), as administrative agent, collateral agent, and lender, and certain other parties, including GECC, as lenders (the "Lenders"). The Credit Agreement provides for a revolving line of credit of $50 million, subject to specified reserves and a defined borrowing base (the "Revolving Facility"), and a $225 million term loan, to be amortized in accordance with schedules set forth in the Credit Agreement (the "Term Loan Facility").

13. As security for their obligations under the Credit Agreement, the Debtors granted security interests in, and liens upon, substantially all of their assets, with relative priority between GECC, as sole lender under the Revolving Facility, and the Lenders, including GECC, as lenders under the Term Loan Facility, determined by intercreditor provisions of the Credit Agreement. Specifically, the revolving lender has senior priority on current assets, including cash, accounts receivable, and inventory, and junior priority on fixed assets, including the Debtors' two mills and equipment; similarly, the term lenders have senior priority on fixed assets and junior priority on current assets.

14. As of the Petition Date, approximately $41 million was outstanding under the Revolving Facility, and approximately $213 million, including capitalized unpaid interest, was outstanding under the Term Loan Facility. The Revolving Facility and the Term Loan Facility both mature on March 31, 2012.

Circumstances Leading to the Debtors' Bankruptcy Filings

15. Like other companies in the newsprint and paper-related industries, a variety of external factors have led to a decline in the Debtors' revenue over the last several years, while at the same time the cost of necessary raw materials has increased. In response, the Debtors undertook cost-cutting and other measures, but, nonetheless, they fell out of compliance with certain covenants under the Credit Agreement and have otherwise been in default thereunder since June 2011.

16. For several months, the Debtors have engaged in restructuring discussions with GECC and entered into a forbearance agreement with GECC and the Lenders, which expired on or about September 12, 2011. On October 12, 2011, GECC took actions that resulted in the Debtors' bank accounts being frozen and permitted only limited funding thereafter.

17. Since that time, the Debtors have attempted to negotiate the terms of a consensual DIP financing arrangement and a global financial restructuring. Although such negotiations have not yet been completed, in connection with any agreement, it is anticipated that the Lenders will require the Debtors to conduct a going-concern sale process, and the Lenders have expressed a willingness to serve as a "stalking horse" bidder in such sale process. The Debtors have now sought Chapter 11 protection and intend to continue such negotiations, including attempting to arrange a temporary consensual use of cash collateral to preserve the value of the Debtors.

**FACTUAL BACKGROUND**

18. As described above, in connection with the Revolving Facility and the Term Loan Facility, the Debtors granted security interests and liens to GECC, on behalf of the

Lenders, on substantially all of the Debtors' assets (as detailed in the Credit Agreement, the "Pre-Petition Collateral").

19. The Revolving Facility bears interest at 6.75%, and the Term Loan Facility bears interest at 9.75% (plus 4% PIK interest). A conformed copy of the Credit Agreement, taking into account all amendments and modifications thereto, is attached hereto as Exhibit A.[3]

20. As of the Petition Date, the Debtors had approximately $5.2 million of cash on hand, which arguably constitutes Cash Collateral. In addition, the Debtors currently forecast receipt of more than $30 million of additional potential Cash Collateral over the next approximately three weeks from operations, resulting in projected cash on hand at the end of the period covered by the Budget of approximately $6.4 million.

21. The Debtors need access to Cash Collateral during these cases to operate their business and work toward a potential DIP financing arrangement and, hopefully, a global restructuring or other exit strategy. The Debtors were unable to obtain a formal agreement for financing these cases with the Lenders or any other party prior to the Petition Date, but they hope to continue negotiations with GECC and other parties regarding the use of Cash Collateral, as well as a potential satisfactory DIP financing arrangement.

22. Nonetheless, at this time, the Debtors do not believe they have any currently-available, alternative sources of financing to fund operations other than what may be Cash Collateral, and if they are not permitted to use such potential Cash Collateral, the Debtors could be forced to convert these cases to Chapter 7 cases. Thus, the Debtors request that this

---

[3] The maturity date for the Credit Agreement was extended, with the consent of all required parties, until March 31, 2012. This extension is not reflected on Exhibit A.

6

RLF1 5592991v. 1

Court permit them to use Cash Collateral for the next approximately three weeks, while they continue to attempt to negotiate with GECC, the Lenders, and/or other parties on a longer financing arrangement.

23. As detailed in the three-week budget ending December 2, 2011 (the "Budget") attached hereto as Exhibit B, the Debtors expect to be cash-flow positive during this time period (and at least neutral when use of inventory and collection of accounts payable are considered),[4] and in any event, because operating in Chapter 11 provides for a much superior alternative from a valuation perspective than liquidation in Chapter 7, including for the benefit of the Lenders, who will be "adequately protected" by the continuation of the Debtors' operations, regardless of whether such operations preserve cash.

**RULE 4001 STATEMENT**

24. In accordance with Bankruptcy Rule 4001, a concise statement of the requested relief follows:

    (a)    Parties with Interest in Cash Collateral. The only parties with a potential interest in Cash Collateral are the Lenders.

    (b)    Purposes for the Use of Cash Collateral. The Debtors would be permitted to use Cash Collateral from whatever source for general corporate purposes and costs and expenses related to these cases in accordance with the Budget, subject to a cumulative disbursement variance, across line items, of 10% in the aggregate for projected disbursements.

---

[4] The Budget does not account for deposits that are proposed to be set aside by the Debtors in accordance with the *Debtors' Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services* that was filed contemporaneously herewith. Any such deposits should be returned to the Debtors at the conclusion of these cases or used to pay related final utility bills, and as such, the Debtors do not believe that the Lenders need to be adequately protected for any such "use" of Cash Collateral.

(c) <u>Termination Date</u>.  Subject to the Final Hearing (as defined below), the use of Cash Collateral would terminate approximately three weeks (December 2, 2011) after the entry of an order (the "Interim Order") approving the relief requested in this Motion on an interim basis or such later date agreed to by the parties or ordered by this Court.

(d) <u>Adequate Protection</u>.  To the extent Cash Collateral is encumbered by any liens of the Lenders, the Lenders would receive, pursuant to Bankruptcy Code §§ 361, 362, and 363(e), as adequate protection on account of the Debtors' use thereof and any other diminution in value, additional and replacement security interests and liens ("Replacement Liens") and an allowed superpriority administrative expense claim, as provided and to the full extent allowed by Bankruptcy Code §§ 503(b) and 507(a), net of any charges that the Debtors may incur in maintaining the value of the Pre-Petition Collateral, including pursuant to Bankruptcy Code § 506(c) ("Superpriority Claim"); <u>provided</u>, <u>however</u>, that the Replacement Liens and the Superpriority Claims would be subject and subordinate to a carve out (the "Carve Out") for (i) statutory fees payable to the United States Trustee and the Clerk of the United States Bankruptcy Court for the District of Delaware, (ii) approved unpaid and outstanding fees and expenses of the Debtors' retained professionals and any professionals retained by any official committees appointed in these cases that are incurred after the Petition Date, (iii) any accrued but unpaid post-petition salaries and wages of the Debtors' employees, (iv) any <u>ad</u> <u>valorem</u> taxes that become due and owing after the Petition Date, and (v) the Debtors' other costs and expenses in connection with operating their business during the period in which Cash Collateral is to be used.

## RELIEF REQUESTED

25. By this Motion, the Debtors request entry of an order (a) authorizing the use of Cash Collateral, (b) granting adequate protection to the Lenders in connection therewith, and (c) granting related relief, including schedule a further hearing on the requested relief (the "Final Hearing").

## BASIS FOR RELIEF

26. As detailed below, to the extent that the Debtors use Cash Collateral of any of the Lenders, the Debtors submit that the Lenders will be adequately protected from any

8

such use and against any diminution in value by (a) the grant of the Replacement Liens, (b) the allowance of the Superpriority Claim, and (c) the avoidance of the likely adverse impact on the value of the Pre-Petition Collateral that could occur if the Debtors were denied the use of the cash generated by their business and were, therefore, forced to shut-down their operations and/or liquidate their assets.

The Proposed Use of Cash Collateral
<u>Is Appropriate and Should Be Authorized</u>

27. Bankruptcy Code § 363(c)(2) sets forth the requirements for a debtor's proposed use of cash collateral, providing, in pertinent part, that:

> [t]he trustee may not use, sell, or lease cash collateral ... unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

28. The proposed use of Cash Collateral is necessary to preserve the value of the Debtors' assets and property (including the Pre-Petition Collateral) during these cases and will avoid immediate and irreparable harm to the Debtors' estates and creditors, including the Lenders. Moreover, the proposed use of Cash Collateral would prejudice no one; rather, it would affirmatively and directly benefit the Debtors' estates and creditors by enhancing the prospects of a successful outcome for these cases, as opposed to a haphazard liquidation of the Debtors' assets in Chapter 7.

29. It is well established that reorganization is preferable to liquidation. <u>See</u> <u>Nat'l Labor Relations Bd. v. Bildisco & Bildisco</u>, 465 U.S. 513, 528 (1984) (citing legislative history); <u>In re Holley Garden Apartments, Ltd.</u>, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999) (finding that "[a] reorganization plan is usually preferable to a liquidation"). Indeed, when compared to liquidation, reorganization typically provides a greater payment to creditors, while

9

preserving the economic life of the entity and the jobs of its employees.  Holley Garden Apartments, 238 B.R. at 495.

30. It is undisputable that the Debtors require the use of the cash generated in the ordinary course of their business to continue to operate, pay employees, and satisfy claims of their vendors.  By this Motion, the Debtors are only currently seeking authority to use Cash Collateral to the extent necessary, subject to the Budget, to fund operations and these cases for approximately three weeks, while they attempt to negotiate and finalize a more definitive post-petition financing or other similar arrangement.

31. The Debtors do not have any other currently-available sources of funds other than Cash Collateral, and any interruption in the Debtors' ability to provide services to their customers (i.e., by shutting down mills or furloughing employees) could have a devastating impact upon the Debtors and the value of their enterprise.  Moreover, the uncertainty concerning the Debtors' financial condition could also greatly reduce their ability to procure goods and services from essential vendors and suppliers.

32. Thus, for the reasons set forth above, the Debtors submit that the proposed use of Cash Collateral is appropriate, necessary, and justified under the circumstances.

The Proposed Adequate Protection is Appropriate and Sufficient

33. Bankruptcy Code § 363(e) provides that "on request of an entity that has an interest in property ... proposed to be used, sold, or leased, by the trustee, the court ... shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  Examples of adequate protection are provided in Bankruptcy Code § 361 and include, but are not limited to:  (a) "additional or replacement lien[s] to the extent that the use [of cash collateral] will cause a decrease in the value of such entity's interest in the property;" and

(b) "granting such other relief ... as results in the realization by the entity of the indubitable equivalent of such entity's interest in the property." See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

34. The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. See In re Swedeland Dev. Group, Inc., 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987)); accord In re DeSardi, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); In re Hollins, 185 B.R. 523, 528 (Bankr. N.D. Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral ... .").

35. The Debtors have proposed to provide the Lenders with the Replacement Liens and the Superpriority Claim, as adequate protection for any diminution in the value of their collateral. As set forth above, replacement liens are specifically referenced in the Bankruptcy Code as an appropriate form of adequate protection, and in addition to retaining a lien on the proceeds of the Pre-Petition Collateral, the Lenders would also be provided additional adequate protection in the form of the Superpriority Claim, subject only to claims under Bankruptcy Code § 506(c), which would be incurred for the Lenders' benefit, and the Carve Out for other costs necessary to run these cases and operate the Debtors' business in Chapter 11.

36. The Debtors submit, though, that the primary adequate protection for the Lenders is preservation of the going-concern and enterprise value of the Debtors (i.e., the

Lenders' collateral) by permitting the Debtors to continue to operate, obtain longer-term financing, and formulate a reorganization or other exit strategy.

37. Indeed, courts have held that adequate protection may be demonstrated by a showing that the value of the lender's collateral is preserved by the debtor's continuing operations in Chapter 11. See, e.g., In re Snowshoe Co., Inc., 789 F.2d 1085, 1087 (4th Cir. 1986) (affirming lower court's decision to allow use of cash collateral, for among other reasons, to prevent loss of value if debtor ceased operations); In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (allowing use of cash collateral for normal operating and maintenance expenses for collateral); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor allowed to use cash collateral to operate and maintain collateral). On the other hand, if this Court were to deny the limited and narrowly-tailored relief sought herein, the Debtors would be unable to access sufficient operating liquidity to meet their post-petition obligations on a timely basis, causing immediate and irreparable harm to their business and their estates, potentially necessitating a hurried liquidation.

38. Thus, for the reasons set forth above, the Debtors submit that the proposed adequate protection for the Lenders for the use of Cash Collateral is appropriate and sufficient and, accordingly, that the requested relief is in their best interests and the best interests of their estates and creditors and, therefore, should be granted.

## REQUEST FOR A FINAL HEARING

39. Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion. The Court may, however, conduct an expedited hearing prior to the expiration of such 14-day period to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

40. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court (a) schedule the final hearing as soon as possible to consider approval of the Debtors' use of Cash Collateral on a final basis and (b) authorize the Debtors, pursuant to the terms of the Interim Order, to use Cash Collateral in accordance with the Budget prior to the Final Hearing. If the Debtors are unable to obtain the immediate use of Cash Collateral, they will be required to curtail their operations and potentially convert these cases to Chapter 7 cases, which would cause immediate and irreparable to them and to their creditors, including the Lenders.

## LOCAL RULE 4001-2(a)

41. Neither this Motion nor the Interim Order contains any provisions identified in Local Rule 4001-2(a)(i).

42. This Motion complies with Local Rule 4001-2(a)(ii).

## NOTICE

43. Notice of this Motion has been given via overnight delivery service, e-mail, facsimile, and/or hand delivery, as appropriate, to the United States Trustee; the 30 largest unsecured non-insider creditors of the Debtors on a consolidated basis; counsel to GECC, as agent to the Lenders; the Securities and Exchange Commission; the United States Attorney's Office for the District of Delaware; the United States Attorney General; the Internal Revenue Service; and any other known secured creditors of the Debtors. As this Motion is seeking first-day relief, notice hereof and of any order entered hereon will be served in accordance with Local Bankruptcy Rule 9013-1(m). Due to the urgency of the circumstances, the Debtors submit that no other or further notice of this Motion is required.

## NO PRIOR APPLICATION

44. No previous request for the relief sought in this Motion has been made to this or to any other court.

13

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form of the Interim Order attached hereto as <u>Exhibit C</u>, granting the relief requested in this Motion and such other and further relief as may be just and proper under the circumstances.

Dated: November 15, 2011         Respectfully submitted,
       Wilmington, Delaware

*/s/ Lee E. Kaufman*
Mark D. Collins (No. 2981)
Lee E. Kaufman (No. 4877)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Joel H. Levitin
Richard A. Stieglitz Jr.
Michael R. Carney
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005-1702
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Proposed Attorneys for the Debtors
and Debtors-in-Possession*