**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SP NEWSPRINT HOLDINGS LLC, <u>et al.</u>,[1] | ) | Case No. 11-13649 (CSS) |
| | ) | |
| | ) | Joint Administration Pending |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF EDWARD D. SHERRICK
IN SUPPORT OF DEBTORS' FIRST-DAY PLEADINGS**

Edward D. Sherrick declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Edward D. Sherrick, and I am over 21 years of age.  I am of sound mind and, if called to testify, I will attest to the facts described herein.

2.      I am Executive Vice President and Chief Financial Officer of the above-captioned debtors and debtors-in-possession (the "Debtors").  As such, I am familiar with the day-to-day operations, business, and financial affairs of each of the Debtors.

3.      On November 15, 2011 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors have sought an order directing that their Chapter 11 cases be jointly administered by this Court, and they have filed additional motions (some of which seek emergency relief) in the proposed lead case of SP Newsprint Holdings LLC.

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each of the Debtors' tax identification numbers, are:  SP Newsprint Holdings LLC (6180); SP Newsprint Co., LLC (7779); SP Recycling Corporation (2936); and SEP Technologies, L.L.C. (2955).

4.     The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No trustee or examiner has been appointed in these cases.

5.     I submit this declaration (the "Declaration") in support of certain of the First-Day Pleadings (as defined below).

6.     All facts set forth in this Declaration are based upon my personal knowledge, information, and belief supplied or verified to me by other members of the Debtors' senior management, other employees of the Debtors, or other parties familiar with the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.

The Debtors and Their Business

*SP Newsprint Holdings LLC*

7.     SP Newsprint Holdings LLC, a Delaware limited liability company, is the direct or indirect corporate parent of all of the other Debtors.

*SP Newsprint Co., LLC*

8.     SP Newsprint Co., LLC ("SP"), a Georgia limited liability company and one of the Debtors' two main operating companies, is one of the largest producers of newsprint (paper on which newspapers are printed) in North America.  SP operates two newsprint mills located in Dublin, Georgia, and Newberg, Oregon.

9.     The Dublin mill, which is located 145 miles southeast of Atlanta, Georgia, was opened in 1979 and is currently one of the largest 100% recycled newsprint mills in North America.  The Newberg mill, which is located 25 miles southwest of Portland, Oregon, was acquired by SP in 1999 and is one of only three suppliers on the West Coast able to meet California's stringent recycled content requirement for newsprint.

- 2 -

*SP Recycling Corporation*

10.     SP Recycling Corporation ("SPRC"), a Georgia corporation and the Debtors' other operating company, was established in 1980 as a means for SP to secure a ready supply of recycled fiber, a key raw material for newsprint.

11.     SPRC currently has 23 recycling centers in nine states that annually collect and/or purchase approximately 941,000 metric tons of old newspaper (ONP), 140,000 tons of sawmill residual chips, 295,000 tons of other paper grades, and 97,000 tons of other materials through drop-off and curbside collections and long-term contracts with various municipalities.  SPRC also handles a range of other recyclable materials, including metals and plastic, which are sorted and resold to other recycling firms.  In addition to the material it collects, SPRC buys ONP on the open market from suppliers in 22 states.

*SEP Technologies, L.L.C.*

12.     SEP Technologies, L.L.C., a Delaware limited liability company, does not currently have any operations or material assets.

The Debtors' Employees

13.     As of the Petition Date, the Debtors employed approximately 670 people.

14.     Certain high-level managerial functions, including mine, are provided by Brant Industries, Inc. ("BI"), in exchange for a management fee.  For more than three months prior to the Petition Date, to help preserve the Debtors' liquidity, BI deferred collecting its management fee.  The management fee is included in the Debtors' proposed budget for these cases and is anticipated to be paid in the ordinary course of business as an administrative expense of the Debtors' estates.

RLF1 5593003v. 1

The Debtors' Capital Structure

15.     On or about March 31, 2008, SP Newsprint Merger LLC (a predecessor of the Debtors), as borrower, and each of the Debtors, as guarantors, entered into a $275 million credit agreement (as amended from time to time and including all related documents, schedules, and agreements, the "Credit Agreement") with General Electric Capital Corporation ("GECC"), as administrative agent, collateral agent, and lender, and certain other parties, including GECC, as lenders (the "Lenders").  The Credit Agreement provides for a revolving line of credit of $50 million, subject to specified reserves and a defined borrowing base (the "Revolving Facility"), and a $225 million term loan, to be amortized in accordance with schedules set forth in the Credit Agreement (the "Term Loan Facility").

16.     As security for their obligations under the Credit Agreement, the Debtors granted security interests in, and liens upon, substantially all of their assets, with relative priority between GECC, as sole lender under the Revolving Facility, and the Lenders, including GECC, as lenders under the Term Loan Facility, determined by intercreditor provisions of the Credit Agreement.  Specifically, the revolving lender has senior priority on current assets, including cash, accounts receivable, and inventory, and junior priority on fixed assets, including the Debtors' two mills and equipment; similarly, the term lenders have senior priority on fixed assets and junior priority on current assets.

17.     As of the Petition Date, approximately $41 million was outstanding under the Revolving Facility, and approximately $213 million, including capitalized unpaid interest, was outstanding under the Term Loan Facility.  The Revolving Facility and the Term Loan Facility both mature on March 31, 2012.

Circumstances Leading to the Debtors' Bankruptcy Filings

18.     Like other companies in the newsprint and paper-related industries, a variety of external factors have led to a decline in the Debtors' revenue over the last several years, while at the same time the cost of necessary raw materials has increased.  In response, the Debtors undertook cost-cutting and other measures, but, nonetheless, they fell out of compliance with certain covenants under the Credit Agreement and have otherwise been in default thereunder since June 2011.

19.     For several months, the Debtors have engaged in restructuring discussions with GECC and entered into a forbearance agreement with GECC and the Lenders, which expired on or about September 12, 2011.  On October 12, 2011, GECC took actions that resulted in the Debtors' bank accounts being frozen and permitted only limited funding thereafter.

20.     Since that time, the Debtors have attempted to negotiate the terms of a consensual DIP financing arrangement and a global financial restructuring.  Although such negotiations have not yet been completed, in connection with any agreement, it is anticipated that the Lenders will require the Debtors to conduct a going-concern sale process, and the Lenders have expressed a willingness to serve as a "stalking horse" bidder in such sale process.  The Debtors have now sought Chapter 11 protection and intend to continue such negotiations, including attempting to arrange a temporary consensual use of cash collateral to preserve the value of the Debtors.

<u>The First-Day Pleadings</u>

21.     I understand that the Debtors have filed the following motions and applications (collectively, the "First-Day Pleadings"):[2]

*Routine and/or Administrative Relief Requested*:

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First-Day Pleadings.

a.      Debtors' Motion for Joint Administration;

b.      Debtors' Motion for Order Extending Time to File Schedules and Statements; and

c.      Debtors' Application to Retain and to Employ GCG, Inc., as Claims, Notice, and Balloting Agent.

*"First-Day" Relief Requested*:

a.      Debtors' Motion for Order (i) Authorizing Continued Use of Existing Bank Accounts, Cash Management System, and Checks and Business Forms and (ii) Approving Temporary Waiver of Deposit and Investment Requirements;

b.      Debtors' Motion for Interim and Final Orders Authorizing Them to Pay Pre-Petition Wages and Salaries and to Pay and Honor Pre-Petition Employee Benefits and Related Obligations

c.      Debtors' Motion for Order Authorizing Payment of Pre-Petition Claims of Certain Potential Lienholders;

d.      Debtors' Motion for Order Authorizing Payment of Pre-Petition Taxes;

e.      Debtors' Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services;

f.      Debtors' Motion for Order Authorizing Them to Honor Certain Pre-Petition Customer Programs; and

g.      Debtors' Motion to (i) Authorize Use of Cash Collateral, (ii) Grant Adequate Protection to Lenders, and (iii) Grant Related Relief.

*Motions and Applications to be Heard at a Later Date*:

a.      Debtors' Application for Authority to Employ and to Retain Cahill Gordon & Reindel LLP <u>Nunc</u> <u>Pro</u> <u>Tunc</u> to the Petition Date;

b.      Debtors' Application to Employ and Retain AP Services, LLC, and Designate Alan D. Holtz Senior Vice President—Restructuring, and Richard S. Abbey Vice President—Restructuring;

c.      Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals;

d. Debtors' Motion for Order Authorizing Them to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of Business;

e. Debtors' Motion for Order Authorizing Them to (i) Assume Insurance Financing Agreements and (ii) Continue and/or Modify Pre-Petition Insurance Coverage; and

## ROUTINE AND/OR ADMINISTRATIVE RELIEF REQUESTED

Motion for Joint Administration

22. During the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of the Debtors.

23. All of the Debtors are affiliates, under the Bankruptcy Code, as I understand such term.

24. I believe that joint administration of the Debtors' Chapter 11 cases will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to file duplicate motions, enter duplicate orders, and forward duplicate notices to creditors and other parties-in-interest, which would result in unnecessary costs and expenses for the Debtors and unnecessary burden for the Court.

25. I believe it is appropriate to designate SP Newsprint Holdings LLC as the main bankruptcy case because its case was filed first, and because it is the direct or indirect corporate parent of all of the other Debtors.

Debtors' Motion for Order Extending Time
to File Schedules and Statements

26. The Debtors have requested that the Court extend the time within which they must file the Schedules, for a total of 60 days from the Petition Date, through and including January 16, 2012.

- 7 -

27.     I understand that the Debtors must gather information from various documents and locations and complete the closing of their books and records as of the Petition Date or other dates, as appropriate, and then the Debtors (and their counsel and other advisors) must review that information and prepare and verify the Schedules.  Given the critical matters that they are currently dealing with, I believe that the Debtors need at least 60 days from the Petition Date to prepare the Schedules for filing.

Debtors' Application to Retain
and to Employ GCG, Inc., as
Claims, Notice, and Balloting Agent

28.     The Debtors have thousands of creditors and other potential parties-in-interest.

29.     Upon information and belief, the Clerk's Office is not equipped for these cases to (a) distribute notices, (b) process all of the proofs of claim filed, and (c) assist in the balloting process.

30.     I believe that engaging an independent third party to act as an agent of the Court and the Clerk's Office is the most effective, efficient, and cost-conscious manner by which to distribute notices, process proofs of claim, and perform other related administrative tasks for these cases.

31.     The Debtors have requested approval to retain GCG to assist them and the Clerk's Office, as necessary, to distribute notices, to process proofs of claim, to tabulate ballots, and to fulfill other administrative tasks pertaining to these Chapter 11 cases.

32.     I believe that GCG is well qualified to serve in the capacity as claims, notice, and balloting agent for these cases and that GCG's retention is in the best interests of the Debtors and in the best interests of their estates and creditors.

- 8 -

33.     I, along with other representatives of the Debtors, chose GCG, a firm that specializes in noticing and ballot tabulation in Chapter 11 cases, based on both its experience and the competitiveness of its fees, and because of GCG's knowledge of the Debtors and familiarity with the Debtors' key employees on account of GCG's prior retention in a case of an entity well known to the Debtors and their senior management team.

34.     Further, I understand that the rates to be charged by GCG for its services in connection with noticing, claims processing, and the balloting process are competitive and are generally at or below the rates charged by GCG's competitors.

**"First-Day Relief" Requested:**

Debtors' Motion for Order (i) Authorizing Continued Use of Existing Bank Accounts, Cash Management System, and Checks and Business Forms and (ii) Approving Temporary Waiver of Deposit and Investment Requirements

35.     The Debtors have a number of Accounts that they use in the ordinary course of business to enable them to manage their cash and to meet their obligations in a timely and efficient manner.

36.     All of the Accounts are in the name of debtor SP Newsprint Co., LLC.

*Lockbox Account*

37.     Each night, cash in the operating accounts for the Debtors' mills and recycling plants, as detailed below, is swept into account number 2079900418501 (the "Lockbox Account"), with Wells Fargo.

38.     Historically, the balance in the Lockbox Account was, in turn, swept nightly into an investment account, but such account was closed prior to the Petition Date.

39. As of the Petition Date, approximately $5,353,150 was in the Lockbox Account.

*Operating Accounts*

40. The Debtors have two other zero-balance operating accounts with Wells Fargo that are used to fund specific aspects of their operations, including paying accounts payable for the Debtors' mills and recycling plants:[3]

   a) first, the Debtors utilize account number 079900417609 (the "Mill Operating Account") to process checks written by, and received from customers of, the Debtors' mills in Georgia and Oregon; and

   b) second, the Debtors utilize account number 2079900410936 (the "SPRC Operating Account") to process checks written by, and receive payments from customers of, the Debtors' recycling plants.

41. Balances in the Mill Operating Account and the SPRC Operating Account are swept nightly into the Lockbox Account, and these accounts are funded only when necessary from the Lockbox Account.

*CIGNA Disbursement Account*

42. The Debtors also maintain account number 38233774 (the "CIGNA Disbursement Account") at Citibank, for payments to certain of the Debtors' employees that are entitled to receive short-term disability payments pursuant to a self-insured insurance plan administered by CIGNA Healthcare. When claims arise, the CIGNA Disbursement Account is funded from the Lockbox Account.

43. As of the Petition Date, at most, there is a de minimis amount in the CIGNA Disbursement Account.

---

[3] The Debtors also have a zero-balance payroll account number 2079900410952 (the "Old Payroll Account") with Wells Fargo, which they had used to process payroll before they began using Automatic Data Processing, Inc. The Debtors are in the process of closing the Old Payroll Account.

*DIP Financing Account*

44.     Finally, in addition to the foregoing, prior to the Petition Date, the Debtors opened a zero-balance account number 4124325267 (the "DIP Financing Account") with Wells Fargo, in connection with potential debtor-in-possession financing for these cases.

45.     The DIP Financing Account has not been used yet, and as of the Petition Date, it has no balance.

*Maintenance of Existing Bank Accounts*

46.     I believe that authorizing the Debtors to continue to use their existing Accounts and the DIP Financing Account, if the Debtors enter into a DIP financing arrangement, is essential to a smooth transition into Chapter 11 and to avoid disruption to the Debtors' business.

47.     For instance, the Debtors' employees would suffer great hardship if the Debtors were compelled to substitute all new debtor-in-possession accounts (other than the DIP Financing Account, if they enter into a DIP financing arrangement) or modify existing accounts, which could cause delays, confusion, and disruption of payments that I believe would adversely affect employees.  Similar consequences could result if the Debtors had to change accounts with which vendors and suppliers are familiar.

48.     The Debtors have used the cash management procedures for quite some time, and I believe that these procedures constitute ordinary and essential business practices similar to those used by other comparable companies.

49.     The Debtors' cash management system enables them to provide necessary operational funds, to develop more timely and accurate account balance information, and to comply with various statutes and regulations and the intricacies of their particular business.

50.     I believe that any disruption to the Debtors' ordinary business affairs could have dire effects on their ability to transition smoothly into Chapter 11 and efforts to maximize value.

51.     The Debtors will continue to maintain strict records in accordance with past practices with respect to all transfers of cash for reporting and accounting purposes and to ensure that all transactions (including intercompany transactions) can be readily ascertained, traced, recorded properly, and distinguished between pre-petition and post-petition transactions, and if they enter into a DIP financing arrangement, they can employ the DIP Financing Account as a designated "debtor-in-possession" bank account.

*Continued Use of Business Forms*

52.     The Debtors have also requested permission to continue to use their existing business forms, including checks, which I believe would not prejudice any parties-in-interest.  If forced to replace their existing business forms, the Debtors would need to spend a substantial amount of time and money printing new business forms and stationery, which could disrupt the Debtors' ordinary business affairs and interrupt the normal payment of wages and salaries to their employees and invoices of suppliers and vendors.

Debtors' Motion for Interim and Final Orders
Authorizing Them to Pay Pre-Petition Wages
and Salaries and to Pay and Honor Pre-
Petition Employee Benefits and Related
Obligations_____

53.     As of the Petition Date, the Debtors had approximately 678 employees.

54.     All of the Employees working in the Debtors' mills in Dublin, Georgia, and Newberg, Oregon, are employed by SP, and the balance of the Employees are employed by SP Recycling Corporation.  The Employees perform a variety of functions that are critical to the

Debtors' business, including accounting, administration, finance, human resources, maintenance, manufacturing, payroll, procurement and supply, safety, and sales.

55. The Employees are comprised of 135 salaried employees and 543 hourly employees. The compensation and benefits of the Hourly Employees vary depending on the type of position and/or location.

56. The Hourly Employees at the mill in Newberg, Oregon (196 in total), are represented by the Association of Western Pulp and Paper Workers Local 60 labor union. The terms of the employment of the Union Hourly Employees are governed by the CBA.

57. The remainder of the Hourly Employees (347 in total) are not represented by a union.

58. The Debtors generally participate in, or are obligated under, a number of different wage, salary, and benefit structures, programs, and plans.

59. The Debtors are also obligated to provide certain medical, short-term and long-term disability, life and similar insurance, workers' compensation, and other related benefits to the Employees.

60. In connection therewith, the Employees are owed and have accrued various pre-petition payments and benefits that have not yet been paid or otherwise realized.

*Employees' Compensation*

**Wages and Salaries**

61. The Debtors pay the Salaried Employees and the Non-Union Hourly Employees on a bi-weekly basis, largely through wires issued every other Friday.

62. The Salaried Employees are paid current, and the Non-Union Hourly Employees are paid for the period ending the prior Sunday (i.e., five days in arrears). The Union

Hourly Employees are also paid on a bi-weekly basis, largely through wires issued on every other Tuesday for the period ending the prior Wednesday (i.e., one week in arrears).

63.    The Employees are owed wages and salaries for work performed pre-petition, including overtime.

64.    Prior to the Petition Date, the Debtors funded ADP in an amount sufficient to satisfy all of their obligations related to the Pre-Petition Wages and Salaries that may have accrued prior to the Petition Date.

**Bonuses**

65.    Occasionally, the Debtors pay discretionary bonuses to certain employees.

66.    As of the Petition Date, there are no approved, but unpaid, bonuses.

**ADP**

67.    The Debtors utilize ADP to facilitate and process their payroll.

68.    ADP withdraws funds from the bi-weekly payroll shortly after processing payroll for administrative fees, which amount to approximately $11,600 per month.

69.    As of the Petition Date there are no accrued, but unpaid, ADP Fees.

**Withholdings**

70.    In each payroll cycle described above, ADP withholds certain funds for the benefit of third parties.

71.    Specifically, ADP withholds federal, state, and/or local taxes, medical and health deductions, union dues, and other withholdings from the wages and salaries of the Employees, as requested by certain of the Employees or required by federal, state, and local laws, and ADP transfers these withheld funds to the appropriate parties or government agencies according to established payment schedules.

72.     As described above, the Debtors have already funded their payroll obligations that may have accrued prior to the Petition Date, and I anticipate that certain of the funds transferred to ADP will be withheld by ADP on account of such withholdings.

**Garnishments**

73.     As of the Petition Date, under applicable orders requiring the withholding of child support, back-tax payments, and other garnishments, the Debtors expect that ADP will withhold, at most, a de minimis amount from certain of the Employees' paychecks that has not yet been transferred or that has not yet been presented for payment or cleared through the banking system.

**Independent Contractors**

74.     The Debtors supplement their workforce with Independent Contractors.

75.     The Independent Contractors are not employees, and their relationships with the Debtors are governed by individual contracts.

76.     As of the Petition Date, approximately $22,500 has accrued and remains outstanding (including reimbursements) on account of the services rendered by the Independent Contractors, and the Debtors do not owe more than $11,725 to any of the Independent Contractors.

*Vacation and Sick Days*

77.     Certain of the Employees are eligible for paid sick days, vacation days, and other similar benefits.[4]

---

[4]     The Debtors provide the Employees with statutorily-mandated benefits, such as military duty leave, jury duty leave, and family medical leave. The Debtors also provide the Union Hourly Employees with funeral leave and other days off in accordance with the CBA.

- 15 -

78.     The amount of a particular employee's available time-off and the rate at which it accrues are generally determined by such employee's position and length of employment with the Debtors, and in the case of the Hourly Union Employees, by the terms of the CBA.

79.     The Salaried Employees and the Non-Union Hourly Employees earn vacation as follows:[5]

a.      Employees with one to four years of service are entitled to two weeks of vacation each year;

b.      Employees with five to 12 years of service are entitled to three weeks of vacation each year;

c.      Employees with 12 to 17 years of service are entitled to four weeks of vacation each year; and

d.      Employees with more than 18 years of service are entitled to five weeks of vacation each year.

The Union Hourly Employees earn vacation when they have worked 1,000 hours in a given year, as follows:

a.      Employees with one year of service are entitled to one week of vacation each year;

b.      Employees with two to four years of service are entitled to two weeks of vacation each year;

c.      Employees with five to nine years of service are entitled to three weeks of vacation each year;

d.      Employees with 10 to 14 years of service are entitled to four weeks of vacation each year;

e.      Employees with 15 to 19 years of service are entitled to five weeks of vacation each year; and

---

[5]     The Debtors have, on occasion, where appropriate, made certain exceptions to the standard vacation policies in order to attract qualified professionals.

    f.  Employees with 20 years or more of service are entitled to six weeks of vacation each year.

  80.  The Union Hourly Employees that have accrued more than two weeks of vacation may accept payment in lieu of vacation for any additional days, and all of the Hourly Union Employees' floating holidays may also be similarly cashed in. The Union Hourly Employees are paid for earned and unpaid vacation time upon termination from the Debtors.

  81.  The Salaried Employees and the Non-Union Hourly Employees are also entitled to three personal days per year.

  82.  The Salaried Employees and the Non-Union Employees may not carry over earned and unused vacation and personal time from year to year, and any earned and unused vacation or personal time is paid upon separation from the Debtors.

  83.  As of the Petition Date the Debtors have accrued approximately $750,000 on account of vacation days and other paid days off for the Salaried and the Non-Union Hourly Employees and $600,000 of the Union Hourly Employees.

*Reimbursement of Expenses of Employees*

  84.  In the ordinary course of business, the Debtors reimburse the Employees for payment of out-of-pocket expenses attributable to their employment with the Debtors. The Employees are required to submit expense reimbursement forms and copies of applicable receipts for review and approval.

  85.  As of the Petition Date, certain of the Employees may not yet have submitted expense reimbursement requests, or such requests may have been made, but not yet processed.

  86.  The amount of employee expense reimbursement obligations accrued prior to the Petition Date, but not yet reimbursed, is approximately $50,000.

RLF1 5593003v. 1

**Moving and Relocation Expenses**

87.     In the ordinary course of business, the Debtors pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit, including, but not limited to, costs for transportation and storage of household goods, as well as travel expenses.

88.     Approximately $32,917 of the Relocation Expenses that accrued prior to the Petition Date have not yet been reimbursed.

**Cellular Telephone Reimbursement**

89.     The Debtors provide approximately 50 of the Employees with an average monthly reimbursement of $50 relating to their cellular telephone bills.

90.     As of the Petition Date, approximately $500 of the Cell Phone Reimbursement Obligations has accrued, but has not yet been paid.

**Automobile Expenses**

91.     Certain of the Employees are entitled to reimbursement for cost of ownership of cars and mileage expended in the ordinary course of their employment for work-related travel.[6]

92.     On average, the Debtors spend approximately $16,000 per month on the Automobile Expenses, and as of the Petition Date, approximately $16,000 of the Automobile Expenses has accrued, but has not yet been paid.

---

[6]     Although the Debtors issue checks to the Employees entitled to reimbursement of these automobile-related expenses, Runzheimer International, a third-party administrator, calculates the amounts, for which it is paid an annual administration fee of $270 per employee.  As of the Petition Date, $5,000 of these fees have accrued, but have not yet been paid.

93. Certain other of the Employees are entitled to leased cars under the terms of their employment. The Debtors currently lease 12 cars, with aggregate monthly lease payments of approximately $7,000.

94. As of the Petition Date, the Debtors owe approximately $7,000 on account of the Leased Car Payments that accrued prior to the Petition Date, but has not been paid.

**Tuition Reimbursement**

95. The Debtors provide tuition reimbursement for a limited number of the Employees upon completion of pre-approved, qualified courses.

96. As of the Petition Date, $4,000 of the Tuition Reimbursement Expenses has accrued that would need to be paid when applicable courses are completed.

**Safety Expenses**

97. The Debtors provide certain of the Employees with a shoe and uniform and safety glasses allowance (or reimburse related amounts) in accordance with the CBA and, in certain cases, as required by state regulatory agencies. On average, the Debtors spend approximately $2,500 per month on account of the Safety Expenses.

98. Approximately $1,000 of the Safety Expenses have been requested, but not yet paid.

**Corporate Credit Cards**

99. The Debtors provide certain of the Employees with the Corporate Credit Cards for business use (primarily for the purchase of parts and supplies), resulting in monthly payments by the Debtors of approximately $15,000.

100. As of the Petition Date, the Debtors owe as much as $30,000 on account of pre-petition obligations relating to the Corporate Credit Cards.

RLF1 5593003v. 1

*Employees Insurance Plans and Programs*

101.    As described below, the Debtors offer the Insurance Plans and Programs

to the Employees:

a.    *Medical Insurance*: the Debtors provide medical benefits and prescription drug coverage for the Employees through a medical insurance plan with UHC.  In connection with the Medical Plan, the Debtors pay a monthly premium to UHC of approximately $800,000, with a portion thereof funded through employee contributions.

b.    *Dental Insurance*: the Debtors also provide dental insurance to the Employees through an employer-sponsored plan with UHC.  The Debtors pay UHC approximately $57,500 per month as a premium for this coverage, with a portion thereof funded through eligible employees' contributions.

c.    *Travel Insurance*: the Debtors have special travel accident insurance for Employees that are injured or may need medical coverage on an emergency basis while traveling.  The Debtors pay approximately $6,000 annually to Mutual of Omaha for this coverage.

d.    *COBRA Benefits*:  pursuant to COBRA, the Debtors offer eligible former employees the opportunity to continue insurance coverage under the Debtors' then-existing medical and dental plans. Eligible former employees who elect to participate in COBRA are entitled by law to insurance coverage for up to 18, 29, or 36 months.  COBRA participation is managed by Cobraserve through Conexis (part of UHC), which charges a monthly service fee of $518 that is collected from the participating former employees (along with the cost of the COBRA coverage).  COBRA payments vary based on the number of former employees electing coverage. As of the Petition Date, the current amount owed to Conexis on account of its management of COBRA-related services is $1,555.[7]

e.    *Flexible Spending Plan*: the Debtors offer a flexible spending plan through Wageworks that allows participating employees to have the Debtors withhold, on a pre-tax basis, amounts for reimbursement of eligible medical and dental care expenses, up to limits set by the Internal Revenue Service.  Approximately 130 of the Employees participate in the Debtors' flexible spending plan.

---

[7]    The Debtors also pay for COBRA benefits for two former employees who were injured at one of the Debtors' mills.

As of the Petition Date, no amounts have been withheld, but not yet transferred to Wageworks, on account of the flexible spending plan.

In addition, the Debtors provide various life and disability insurance plans and mandatory workers' compensation coverage for the Employees:

a. *Life and Accidental Death and Dismemberment Insurance*: the Debtors provide all of the Employees with life and accidental death and dismemberment insurance with coverage up to twice their yearly compensation, with a maximum benefit of $300,000, at no cost. The Debtors also offer the Employees the opportunity to purchase supplemental and dependent life insurance. This coverage is provided through CIGNA, and each of the Employees' share of the costs, when applicable, is based on the status of the particular employee and coverage. The aggregate average monthly premium that the Debtors pay to CIGNA to provide these benefits is approximately $13,700.

b. *Short-Term Disability Insurance*: the Debtors provide short-term disability insurance to certain of the Employees. The Union Hourly Employees are entitled to receive short-term disability coverage pursuant to a self-insured plan, pursuant to which the Debtors are billed monthly for the actual claims, which have historically averaged approximately $15,000. For other of the Employees entitled to receive short-term disability insurance, CIGNA provides such benefits, for which the Debtors pay an average monthly premium of approximately $1,700.

c. *Long-Term Disability Insurance*: the Debtors provide long-term disability insurance to all of the Employees, other than the Union Employees, which is funded by the Debtors and by monthly payroll deductions from non-exempt employees. The aggregate average monthly premium that the Debtors pay to CIGNA to provide such benefits is approximately $12,200.

d. *Workers' Compensation*: under the laws of the various states in which they operate, the Debtors are required to provide all of the Employees with workers' compensation coverage for injuries occurring in the course of their employment. The Debtors are self-insured for workers' compensation, and they maintain the Workers' Compensation Policy, which has a $350,000 deductible limit for each catastrophic claim, up to an aggregate deductible limit of $2,750,000, through The Hartford. The Workers' Compensation Policy has a 12-month term that will expire, unless renewed, on June 28, 2012. The Debtors' current estimated annual

premium under the Workers' Compensation Policy is approximately $270,000, and as of the Petition Date, there were no premiums or other amounts outstanding.

102.    The aggregate outstanding premiums relating to the Insurance Plans and Programs that accrued prior to the Petition Date, but have not yet been paid, total approximately $1 million.

*Retirement Savings Plan*

103.    The Debtors sponsor the Retirement Savings Plan, which, as I understand it, is a defined-contribution plan.

104.    The Salaried Employees and the Hourly Non-Union Employees are eligible to participate in the Retirement Savings Plan, and each month, the Debtors fund the Retirement Savings Plan in an amount based on a percentage of participating employees' compensation.

105.    Specifically, for eligible employees under age 35, the Debtors contribute 3% of such employees' compensation to the Retirement Savings Plan.  This amount increases to 4.5% of compensation for eligible employees ages 35 to 49, and to 6% for eligible employees ages 50 and over.

106.    The Debtors pay approximately $150,000 per month to fund Retirement Contributions.   As of the Petition Date, there are no accrued, but unpaid, Retirement Contributions.

*401(k) Plan*

107.    The Salaried Employees and the Hourly Non-Union Employees are also eligible to participate in the 401(k) Plan upon employment with the Debtors.

108.     Under the 401(k) Plan, the Debtors withhold, at an eligible employee's request, up to 50% of such employee's annual, pre-tax pay for contribution to the 401(k) Plan (subject to applicable limitations imposed by the Internal Revenue Code).

109.     The Debtors match 100% of the first 1% of the Salaried Employees and the Hourly Non-Union Employees' contributions to their individual 401(k) Plans and 50% of the next 5% of each such employees' contributions, and with respect to the Hourly Union Employees, the Debtors match 50% of the first $3,400 contributed to each of the Hourly Union Employees' individual 401(k) Plan.

110.     The Debtors withhold approximately $135,000 in the aggregate each month from participants' paychecks on account of their contributions to the 401(k) Plan, and the cost of the Matching Obligations is approximately $75,000 per month, and, as of the Petition Date, there are no accrued, but unpaid, Matching Obligations outstanding.

*Pension Plan*

111.     The Debtors sponsor an ERISA-qualified, defined benefit pension plan with Wachovia Bank, N.A., as trustee.

112.     The Pension Plan was frozen, and only those of the Employees that were participants in the Pension Plan on or prior to December 31, 2008, are eligible to participate in the Pension Plan.

113.     As of the Petition Date the Pension Plan is underfunded by at least $20 million.

*Severance Plan*

114.     The Debtors have a formal severance policy to provide transitional support to assist former employees with the loss of employment with the Debtors.

115.    Pursuant to the Severance Plan, Employees (excluding Union Hourly Employees) are entitled to receive severance benefits in the event their employment with the Debtors is terminated, other than for cause.  With certain exceptions, qualified employees are entitled to receive severance pay upon executing an appropriate release.

116.    In general, Employees considered to be "senior management" are entitled to severance equal to two weeks' pay times years of service (though not less than eight weeks' pay nor more than 16 weeks' pay, in the aggregate); Employees considered to be "non-management" are entitled to severance equal to one week's pay times years of service (not less than four weeks' pay nor more than 16 weeks' pay, in the aggregate).

117.    As of the Petition Date approximately $10,159 under the Severance Plan has accrued, but has not yet been paid.

118.    I believe that, if the amounts owed to the Employees are not paid, insurance premiums are not paid in the ordinary course, or other benefits delayed or terminated, the Employees would suffer extreme personal hardship and, in many cases, would be unable to pay their basic living and related expenses, causing serious harm to them and their families, and potentially making it difficult or impossible to continue their employment with the Debtors.  I believe that this would severely disrupt and irreparably impair the Debtors' relationships with the Employees, may cause many to terminate their employment with the Debtors at the very time when their expertise, dedication, confidence, and cooperation are most critical, and seriously jeopardize the Debtors' ability to operate.

119.    I also believe that allowing the Debtors to pay the Employees and to continue to honor related obligations will not harm the Debtors or their estates, but would instead

bolster the morale of the Employees and contribute to a smooth transition to Chapter 11, preserving value for the benefit of the Debtors' estates.

Debtors' Motion for Order Authorizing
Payment of Pre-Petition Claims of Certain
Potential Lienholders

120.    To obtain raw materials critical to their operations and to transport products to their customers or elsewhere, the Debtors have developed a complex supply chain and distribution network, relying heavily on numerous commercial common carriers, movers, shippers, warehousemen, customs brokers, and certain other third-party vendors and service providers ship, transport, store, move through customs, and deliver goods.

121.    At any given time, the Potential Lienholders maintain possession of products vital to the Debtors' operations.  I understand that, under applicable law, the Potential Lienholders may be able to assert statutory and other operational liens against the Debtors' property arising from their possession of the Debtors' goods and the provision of pre-petition services that remain unpaid.

122.    As of the Petition Date, many of the Potential Lienholders had unpaid claims for the Services of approximately $10 million in the aggregate.

123.    I believe that the benefits of paying the Potential Lienholder Claims, to the extent the Debtors deem appropriate, far outweigh the costs associated therewith, as it is essential for the Debtors to ensure that the flow of raw materials and finished products remains constant, timely, and efficient.

124.    In contrast, if the Debtors are unable to pay the Potential Lienholder Claims, I believe that many of the Potential Lienholders may stop providing essential services to the Debtors, potentially (a) delaying raw material shipments to the Debtors' mills and recycling centers and, by extension, shipments of finished product to the Debtors' customers; (b) impairing

the Debtors' ability to generate ongoing operating revenue; and (c) damaging the Debtors' business reputation and harming the Debtors' restructuring efforts, among other things. In fact, even if suitable alternative vendors were available, the time necessary to identify such replacements and integrate them into the Debtors' operations would likely cause significant disruption and harm.

125.    Moreover, and perhaps most importantly, I understand that certain of the Potential Lienholders may be able to assert possessory liens against the Debtors' property that they hold or control.

**Debtors' Motion for Authorization to Pay Pre-Petition Taxes**

126.    In connection with the normal operation of their business, the Debtors collect and/or accrue the Pre-Petition Taxes. For many of the Pre-Petition Taxes and other fees and charges, it is likely that only a portion thereof are pre-petition obligations of the Debtors.

127.    The Debtors are subject to periodic normal course of business audits to assess any unpaid taxes that they may owe, and accordingly, certain taxes or other additional amounts related to the Pre-Petition Taxes may be determined to be owed at a later time.

128.    In addition, I understand that, in the various states in which the Debtors operate, failure to pay the Pre-Petition Taxes could result in the Debtors' forfeiting necessary business licenses, losing the ability to conduct business, or being subject to tax liens and/or penalties.

*Sales and Use Taxes*

129.    The Debtors incur sales and use taxes in certain states in which they conduct business, and they remit such taxes when they come due to the appropriate taxing authorities in such states, on the payment terms outlined below:

| Jurisdiction | Payment Terms | Estimated Payment Due |
|:---:|:---:|:---:|
| Florida | Due on the 20th of each month | $1,200 |
| Georgia | Due on the 20th of each month | $180,120 |
| Kentucky | Due on the 20th of each month | $1,700 |
| Washington | Due on the 20th of each month | $9,165 |

130. Depending on the state, these taxes are either paid by check or by electronic fund transfer. The Debtors customarily perform quarterly "true-ups", and occasionally, they may owe additional amounts.

*Estimated Income Taxes*

131. Certain of the Debtors pay federal estimated income taxes and similar quarterly taxes in Florida, Georgia, Kentucky, Louisiana, Oregon, South Carolina, Tennessee, and Virginia. As of the Petition Date, the Debtors will owe up to the following amounts of quarterly income taxes, at least a portion of which may have accrued prior to the Petition Date:[8]

| Jurisdiction | Estimated Quarterly Payment |
|:---:|:---:|
| Federal | $170,000 |
| Florida | $3,000 |
| Georgia | $5,000 |
| Kentucky | $500 |
| Louisiana | $1,000 |
| Oregon | $7,500 |
| South Carolina | $200 |
| Tennessee | $1,500 |
| Virginia | $750 |

132. The Debtors generally pay these estimated taxes quarterly, and occasionally, they owe additional amounts when they file their actual, year-end tax returns.

---

[8]     In certain states, the Debtors do not owe any such taxes because they either incurred losses during the applicable period or can carry over net operating losses to offset any taxable income.

*Personal Property Taxes*

133. In addition, certain of the Debtors pay personal property taxes to state and local taxing authorities, at least a portion of which may have been incurred prior to the Petition Date, but have not yet been paid, in the amounts and on the terms outlined below:

| Payee | Payment Terms | Estimated Payment Due |
|---|---|---|
| Bob Davis, Tax Collector St Lucie Co. | Due 12/31/2011 | $1,710 |
| City of Garden City | Due in 2012 | $451 |
| City of Knoxville | Due 2/29/2012 | $2,427 |
| City of Lavergne | Due 2/29/2012 | $1,427 |
| County of Henrico, Virginia | Due in 2012 | $17 |
| E.B.R. Sheriff | Due in 2012 | $5,656 |
| Fulton County Tax Commissioner | Due in 2012 | $3,665 |
| Joe G Tedder, Tax Collector | Due 11/30/2011 | $6,742 |
| J.T. Smallwood | Due in 2012 | $388 |
| Knox County Trustee | Due 2/29/2012 | $2,328 |
| Lee County Tax Collector | Due 11/30/2011 | $1,961 |
| Newell Normand, Sheriff | Due in 2012 | $4,304 |
| Prince William County | Due in 2012 | $7,416 |
| Rutherford County Trustee | Due 2/29/2012 | $3,517 |
| Town of St. Francisville | Due in 2012 | $1 |
| Yamhill County Tax Collector | three installments due 11/15/11, 2/15/12, and 5/15/12 | $509,218 |

RLF1 5593003v. 1

*Real Estate Taxes*

134.    Furthermore, the Debtors pay real estate taxes to state and local taxing authorities in connection with certain of their owned or leased real property, at least a portion of which may have been incurred prior to the Petition Date, but have not yet been paid, on the terms outlined below:

| **Payee** | **Payment Terms** | **Estimated Payment Due** |
|---|---|---|
| City of Forest Part Business Tax Division | Due 12/20/2011 | $19,200 |
| Clackamas County Tax Collector | Due 11/15/2011 | $47,679 |
| Clayton County Tax Commissioner | Due 11/15/2011 | $46,955 |
| Diane Nelson Tax Collector, Pinellas Co. | Due 12/31/2011 | $1,632 |
| Earl K. Wood, Tax Collector | Due 11/30/2011 | $7,175 |
| Laurens County Tax Commissioner | Due 12/20/2011 | $688,658 |
| Lisa Cullen, CFC Brevard County | Due 11/30/2011 | $485 |
| Sumner County Trustee | Due 2/29/2012 | $41 |
| Von Fraser Tax Collector Alachua County | Due 12/31/2011 | $5,100 |
| Yamhill County Tax Collector Clackamas County Tax Collector | three installments due 11/15/11, 2/15/12, and 5/15/12 | $444,120 |

*Other Taxes and Fees*

135.    Finally, the Debtors may have incurred other tax obligations, such as recycling permits, trailer and tag taxes, and business licensing and other miscellaneous taxes and

fees, at least a portion of which may have been incurred prior to the Petition Date, but have not yet been paid, as outlined below:

| Payee | Payment Terms | Estimated Payment Due | Type of Tax or Fee |
|---|---|---|---|
| City of Altamonte Springs | Due in 2012 | $250 | Recycling Permit |
| City of Anderson | Due in 2012 | $80 | Business License |
| City of Greenville | Due in 2012 | $160 | Business License |
| City of Kissimmee | Due in 2012 | $100 | Recycling Permit |
| City of Leesburg | Due in 2012 | $100 | License Renewal |
| City of Spartanburg | Due in 2012 | $55 | Business License |
| Clackamas County | Due in 2012 | $85 | Business License |
| Jefferson County Clerk | Due in 2012 | $758 | Trailer & Tag Taxes |
| Loudoun County | Due in 2012 | $70 | Application & Permits |
| Louisville-Jefferson Metro | Due in 2012 | $100 | License Renewal |
| Michael Corrigan, Tax Collector | Due in 2012 | $60 | Business Tax |
| Mike Hogan Tax Collector | Due in 2012 | $60 | Miscellaneous Tax |
| Parish and City Treasurer | Due in 2012 | $300 | Occupational License Tax |
| Parish of West Feliciana | Due in 2012 | $15 | Roll-Off Tax |
| Patsy Jones Elixson Tax Collector | Due in 2012 | $3,400 | Tag Renewal |

RLF1 5593003v. 1

| Payee | Payment Terms | Estimated Payment Due | Type of Tax or Fee |
|---|---|---|---|
| Pinellas County Tax Collector | Due in 2012 | $7,591 | Tag Renewal |
| State of Louisiana | Due 9/24/2011 | $25 | Business Tax |
| St. Lucie County Tax Collector | Due in 2012 | $28 | Business Tax |
| Tax Collector, Palm Beach County | Due in 2012 | $1,116 | Tag Renewal |

136. It is my understanding that it is necessary for the Debtors to pay the Pre-Petition Taxes when they become due. If they fail to do so, I understand that the Debtors could potentially be restricted from doing business in certain states, with dire effects on their ability to transition smoothly into Chapter 11 and preserve value.

137. I also understand that the failure to pay the Pre-Petition Taxes when due may result in one or more of the taxing or other governmental authorities auditing the Debtors, commencing a similar investigation, or obtaining a lien on certain of the Debtors' assets or property. I believe that audits and/or investigations would unnecessarily divert the Debtors' attention away from these cases and potentially negatively impact the Debtors' value.

138. Similarly, I understand that if a taxing authority were to obtain a lien on any of the Debtors' assets or properties, it may prevent the Debtors from using that property or asset, and a taxing authority may attempt to sell such property or asset, causing an unnecessary distraction during these cases and potentially harming the estates.

139.     In connection with the operation of their business and management of their properties, the Debtors obtain Utility Services from the Utility Companies.

140.     On average, the Debtors spend approximately $4.7 million per month on utility services, and until recently, the Debtors have had a consistently prompt payment history with the Utility Companies.

141.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner, as those obligations become due.

142.     I believe that preventing disruption to the Utility Services, and ensuring continuous access to the Utility Services, are essential to the continued operation of the Debtors' business and, consequently, to the success of these Chapter 11 cases.

Debtors' Motion for Order Authorizing
Them to Honor Certain Pre-Petition
Customer Programs

143.     Prior to the Petition Date, and in the ordinary course of business, the Debtors offered and engaged in programs and practices with customers to remain competitive, to generate goodwill, and to engender loyalty, among other reasons.

144.     Specifically, the Debtors have historically provided certain customers with rebates and refunds, and permitted customers to ensure or to lock in a set price for paper and other products to be delivered in the future, often at a discount.

*The Rebate Program*

145.     The Rebate Program is comprised of two parts:  (a) volume and price discounts and (b) cash rebates.

**Volume and Price Discounts**

146.    Volume discounts are incentives for customers that commit to (and actually do) purchase certain volumes of the Debtors' products. Until a customer purchases a specified volume of material, the customer is invoiced for the full amount due; once the specific volume threshold is reached, however, the discount is reflected against the total amount purchased and netted against the total amount due.

147.    Similarly, price discounts permit certain of the Debtors' customers to establish a differential between the price at which they purchase the Debtors' products and the price at which they sell those products, which differential is credited at the time of purchase. In certain instances, the Debtors also provide price discounts on freight costs.

148.    As of the Petition Date, no actual payment obligations are outstanding on account of volume and price discounts under the Rebate Program.

**Cash Rebates**

149.    The Debtors also provide certain customers with cash rebates that are issued by the Debtors after collecting invoices for a particular month, as determined by a customer's particular sales contract or other arrangement with the Debtors. Similar to volume discounts, once a customer purchases a certain volume from the Debtors, the customer may be eligible to receive a credit that can be applied toward future purchases.

150.    As of the Petition Date, approximately $260,000 of cash rebates under the Rebate Program has accrued and remains outstanding.

*The Refund Program*

151.    The Debtors also maintain the Refund Program, whereby they offer refunds and similar incentives to customers for products that are returned on account of a covered and eligible defect or damage.

152.    Generally, if a customer has a problem with a product sold by the Debtors, the Debtors will often send a representative to assess the problem, and although they may, in certain instances, accept and offer refunds for allegedly-defective product, the Debtors will usually try to negotiate a reduced price for the allegedly-defective product or offer similar incentives instead.  If an allegedly-defective product is, in fact, returned to the Debtors, the Debtors generally credit the customer and look to resell such product to others, if possible.

153.    As of the Petition Date, any amounts owed to customers under the Refund Program are de minimis.

*The Prepayment Program*

154.    Under the Prepayment Program, certain of the Debtors' customers pre-pay for newsprint and other products in order to lock in favorable prices and discounts of up to 2%.

155.    As of the Petition Date, customers participating in the Prepayment Program will have paid approximately $35,000, in the aggregate, prior to the Petition Date, for goods manufactured and sold that are scheduled to be delivered post-petition.

156.    I believe that, if the Debtors were unable to honor their obligations under the Customer Programs, their existing customers and potential new customers may refuse to do business with them, with catastrophic results, especially now, given potential increased pressure from competitors of the Debtors as a result of the filing of these cases.  Considering any lost revenue from the likely defection of current customers (and the potential loss of new customers) absent the requested relief, I believe that the costs of authorizing the Debtors to continue the Customer Programs is far less than the potential costs if the Debtors are not so authorized.

- 34 -

Debtors' Motion to (i) Authorize Use of Cash
Collateral, (ii) Grant Adequate Protection to
Lenders, and (iii) Grant Related
Relief

157.    In connection with the Revolving Facility and the Term Loan Facility, the Debtors granted security interests and liens to GECC, on behalf of the Lenders, on Pre-Petition Collateral.

158.    The Revolving Facility bears interest at 6.75%, and the Term Loan Facility bears interest at 9.75% (plus 4% PIK interest).

159.    As of the Petition Date, the Debtors had approximately $5.2 million of cash on hand, which arguably constitutes Cash Collateral.  In addition, the Debtors currently forecast receipt of more than $30 million of additional potential Cash Collateral over the next approximately three weeks from operations, resulting in projected cash on hand at the end of the period covered by the Budget of approximately $6.4 million.

160.    The Debtors need access to Cash Collateral during these cases to operate their business and work toward a potential DIP financing arrangement and, hopefully, a global restructuring or other exit strategy.  The Debtors were unable to obtain a formal agreement for financing these cases with the Lenders or any other party prior to the Petition Date, but they hope to continue negotiations with GECC and other parties regarding the use of Cash Collateral, as well as a potential satisfactory DIP financing arrangement.

161.    Nonetheless, at this time, I believe that the Debtors do not have any currently-available and viable, alternative sources of financing to fund operations other than what may be Cash Collateral, and if they are not permitted to use such potential Cash Collateral, the Debtors could be forced to convert these cases to Chapter 7 cases.

**Motions and Applications to Be Heard at a Later Date:**

Debtors' Application for Authority to
Employ and to Retain Cahill Gordon &
Reindel LLP <u>Nunc</u> <u>Pro</u> <u>Tunc</u> to the Petition
<u>Date</u>

162.    To facilitate the successful reorganization of their business, and for

bankruptcy advice and counsel during these cases, I believe that the Debtors require the services

of attorneys with knowledge and experience in numerous areas of law, including, without

limitation, bankruptcy, restructuring, finance, tax, real estate, litigation, environmental, and

general corporate matters.

163.    I, along with other representatives of the Debtors, have selected Cahill as

counsel because of its considerable experience in such matters and its previous work for the

Debtors and understanding of their capital structure and business and familiarity with key

employees.

Debtors' Application to Employ and Retain
AP Services, LLC, and Designate Alan D.
Holtz Senior Vice President—Restructuring,
and Richard S. Abbey Vice President—
<u>Restructuring</u>

164.    The Debtors seek to employ and to retain APS to perform crisis

management services for the Debtors and to designate Alan D. Holtz as Senior Vice President—

Restructuring and Richard Abbey as Vice President—Restructuring in these Chapter 11 cases

upon the terms and conditions contained in the Engagement Letter.

165.    I am familiar with the professional standing and reputation of APS from,

among other things, the Debtors' prior engagement of AlixPartners, an affiliate of APS.

166.    I understand that APS has a wealth of experience in providing crisis management services and enjoys an excellent reputation for services it has rendered in large and complex Chapter 11 cases on behalf of debtors and creditors throughout the United States.

167.    I believe that, as a result of the pre-petition work performed on behalf of the Debtors and for a related entity, APS has significant knowledge of the Debtors and their business and is now intimately familiar with the Debtors' financial affairs, debt structure, operations, and related matters.  Moreover, in providing pre-petition services to the Debtors, I believe that APS's professionals have worked closely with the Debtors' management and their other advisors.

168.    Thus, I believe that APS has experience and expertise and specifically relevant knowledge regarding the Debtors that will assist it in providing effective and efficient services in these Chapter 11 cases.

Debtors' Motion for Order Establishing
Procedures for Interim Compensation and
Reimbursement of Expenses of
Professionals

169.    The Debtors have requested the establishment of procedures for compensating and reimbursing Court-approved professionals on an interim basis that I understand are similar to those established in other Chapter 11 cases in this District and elsewhere to permit the Court and all other parties to monitor more effectively the professional fees incurred in these Chapter 11 cases and to allow the Debtors to manage their cash flow better.

170.    I believe that the Compensation Procedures would reduce the burden imposed on the Court, enable key parties-in-interest to monitor more closely professional fees and costs in these cases, and diminish undue financial burdens on the Professionals, as well as ease the administrative burden of these cases.

- 37 -

**Debtors' Motion for Order Authorizing Them to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of Business**

171.    Prior to the Petition Date, the Debtors utilized numerous professionals to provide the services required to assist them in managing their affairs on a day-to-day basis.

172.    I believe that, in light of the costs associated with the preparation of employment and retention and fee applications for such professionals that would receive relatively small fees and/or that would provide services entirely unrelated to these bankruptcy cases, it would be impractical, inefficient, and unnecessarily costly for the Debtors to submit individual applications for each such professional, and accordingly, believe that the Court should dispense with the requirement of individual employment, retention, and fee applications with respect to the Ordinary Course Professionals and that each such Ordinary Course Professional should be retained, subject to the procedures described in the motion.

**Debtors' Motion for Order Authorizing Them to (i) Assume Insurance Financing Agreements and (ii) Continue and/or Modify Pre-Petition Insurance Coverage**

173.    In the ordinary course of business, the Debtors maintain insurance coverage, including, among others, commercial liability, crime, D&O liability, fiduciary liability, general liability, property, terrorism risk, and umbrella insurance policies.  The maintenance of the Insurance Policies is required and necessary to ensure the continued operation of the Debtors' business and to protect the value of their assets.

174.    In addition, to reduce the burden of paying premiums for the Debtors' property insurance policy, the Debtors entered into the Property Premium Financing Agreement. Similarly, to reduce the burden of paying premiums for their remaining policies, the Debtors entered into the General Premium Financing Agreement.

175. The Debtors are current on their obligations under the Financing Agreements and intend to make all future payments thereunder when they became due.

176. Based on a careful analysis of the facts and circumstances of these cases, I believe that the Debtors should assume the Financing Agreements. I also believe that the terms of the Financing Agreements are favorable and that, were the Debtors to reject the Financing Agreements or if they were otherwise terminated, the Debtors would not be able to enter into another premium finance or similar agreement on comparable terms.

177. I believe that in the event of cancellation of the Financing Agreements, the Debtors' business operations and the Debtors' creditors and other parties-in-interest would face significant risks, including potentially the cessation of the Debtors' operations.

[remainder of page intentionally left blank]

Dated: November 15, 2011

By: _____

Name: Edward D. Sherrick
Executive Vice President and CFO
On Behalf of Debtors and Debtors-in-Possession